# ROBERT EARL RAY, JR. #136712
Limestone Correctional facility
28779 Nick Davis rd.
Harvest, al. 35749

## JANUARY 28, 2008

RECEIVED

2008 FEB -8 A 9: 25

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

2:08-CV-89-MEF

**UNITED STATES DISTRICT COURT**
TO: *MARK E. FULLER*
    Middle District Of Alabama
    P.O. Box 711
    Montgomery, Al. 36101-0711

**PUBLIC CORRUPTION & WHITE COLLAR**
TO: *JOSEPH L. FITZPATRICK*
    C/o Sharon E. Ormsby, super. (Senior)
    One Commerce St. Ste. 606
    Montgomery, Al. 36104

**DEPARTMENT OF JUSTICE, CRIMINAL DIVISION**
TO: *RICHARD C. PILGER*
    C/o Sharon E. Ormsby, super. (Senior)
    One Commerce St. Ste. 606
    Montgomery, Al. 36104

# REQUESTED FEDERAL INVESTIGATION / COMPLAINT & AFFIDAVIT WITH MOTION FOR THE ISSUANCE OF FEDERAL WARRANTS UPON MEMBERS OF THE ALABAMA PARDON & PAROLE AGENCY FOR VIOLATING CIVIL RIGHTS

    I, Robert Earl Ray, Jr. an inhabitant of the state of Alabama hereby submit the

following request for an investigation upon the Alabama Pardon & parole Board, due to corruption

within the agency. The following persons who are and were employed with the parole agency in

their official capacities § 242-"*under color of law*" have conspired against my rights secured to

me by the constitution and laws of the United states to injure, oppress and deprive me of my

1

liberty ensured to me by the United States constitution through the fifth and fourteenth amendments. Due to the conspiracy to deprive me of my liberty, the members of the parole agency have violated **18 U.S.C.S. § 241**- *"Conspiracy against rights"* and **18 U.S.C.S. § 242**-*"Deprivation of rights under color of law."* I aver that the *elements of offenses* described in 18 U.S.C.S. § 242 can be found in the allegations raised by me in this complaint / affidavit for warrants of arrest. (1) That the defendants acts did deprive me of rights secured or protected by constitution or laws of United States: (2) that defendants illegal acts were committed under color of law: (3) that I am an inhabitant of the United States (Alabama); (4) and that the defendants acted willfully. **United States V. Senak** (1973, CA7 Ind) 477 F. 2d 304, cert den. (1973) 414 US 856, 38 L. Ed 2d 105, 94 S. Ct. 157 and appeal after remand (1975, CA7 Ind) 527 F. 2d 129, cerrt. (1976) 425 US 907, 47 L. Ed. 2d 758, 96 S. ct. 1500. Federal court has jurisdiction where defendants are charged with depriving my rights and privileges under the constitution of the United States. *"Even though acts of defendants also violated laws of state."* **Williams V. United States**, (1950, CA5 Fla. 179 F 2d 656, aff'd (1951) 341 US 97, 95 L. Ed. 774, 71 S. Ct. 576. Also Title 28 U.S.C. § 1331-*"Supplemental jurisdiction over state claims."* The rights alleged to have been deprived by the defendants are both due process and criminal violations of Alabama State laws. *"Once due process right has been* defined *and made specific by court decisions, right is encompassed by* **18 U.S.C.S. § 242. United States V. Hayes**, (1979, CA5 Tex) 589 F. 2d 811, reh den (1979, CA5 Tex) 591 F 2d 1343 and cert. den (1979) 444 US 847, 62 L. Ed. 2d 60, 100 S. ct. 93. Every right alleged to have been violated by the defendants is clearly established state & federal law. The defendants violated **18 U.S.C.S. § 241** when they conspired to deprive me of my constitutional rights; however, it is not required immediate intent to violate such rights predominate over ultimate purposes that violations were designed to achieve. **United states V.**

2

**Ellis**, (1979, CA3 Pa) 595 F 2d 154, cert den (1979) 444 US 838, 62 L Ed 2d 49, 100 s. ct. 75. The constitutional rights which were violated by the defendants consisted of the following:

# COMPLAINT

On February 2, 1994, the Alabama Pardon & Parole Board granted me parole. See (Exhibit-1) *"Parole Certificate."* I remained on parole for seven years and seven month *until* was arrested by the city of Athens on the charge of Domestic Violence III, which occurred on 9/07/01. On 9/10/01 a " parole violation report" was prepared by parole officer **Marty Bruce Graham.** See (Exhibit-2 (a)). See *"legal facts"* in the report he stated: *"Arrested on 9/07/01. A parole "hold" was placed upon parolee."* This *"parole violation report"* was received by the parole agency on 9/17/01. See (Exhibit-2 (a)) stamped at top corner of the document. On 9/18/01, a *"parole court hearing"* was held at the Limestone county jail by both parole officer's **Marty Bruce Graham & T.C. Bill**. See (Exhibit-3 (a)(b)). On September 20, 2001 agent T.C. Bill, recommended that my parole be revoked. See (Exhibit-3(c)). On October 1, 2001, the parole Board declared me delinquent on the charged parole violation by agent Graham, which he filed on 9/07/01. See (Exhibit-4). On October 23, 2001, the parole board consisting of (**Johnnie Johnson & Nancy McCreary**) revoked my parole relying upon the parole court hearing held on September 18, 2001 and agent Bills recommendation. See (Exhibit-5). The board set my next parole consideration for 10/2006. See (Exhibit-5).

The facts raised above clearly show that my parole was illegally violated in excess of the board's jurisdictional authority and that I have been illegally incarcerated for six years and four months. The above-mentioned acts are violative of state law. Their acts are unauthorized and as a result, their acts should not be binding upon me. Their acts are illegal based upon the following:

The person named in this complaint and affidavit and request for the issuance of warrants for their arrest have constructive knowledge of their unauthorized and illegal acts. They have willfully neglected to perform their duties enjoined upon them by legislature, which has resulted in injury to my person, depriving me of my liberty & freedoms, by exceeding their subject-matter jurisdiction. (Subject-matter jurisdiction refers to a court's "statutory or constitutional power" to adjudicate a case.) That power is derived from the Alabama constitution and the Alabama code. See **Cooper V. Reynolds**, 77 U.S. (10 wall.) 308, 316, 19 L. Ed. 931 (1870) Also **United States V. cotton**, 535 U.S. 625, 630-31, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002). **Title § 15-22-38** states: " *The duties imposed upon the members of the board of pardons and paroles by this article are mandatory, and the limitations and restrictions on the powers of the board or the members thereof shall be strictly construed.* " **Title § 15-22-39** states: "*Any member of the board of pardons and paroles who knowingly or willfully neglects or fails to perform any duty enjoined upon him by the provisions of this article is guilty of a felony.* " I am alleging that the parole board consisting of all persons named in this complaint have willfully neglected a duty enjoined upon them through legislative statute, specifically **§15-22-32(a)** which states: " *Whenever there is reasonable cause to believe that a prisoner who has been paroled has violated his or her parole, the board of pardons and paroles, at its next meeting, **shall declare the prisoner delinquent**. [Thereupon], the board, a single member of the board, a parole revocation hearing officer, or a designated parole officer **shall, as soon as practical, hold a parole court.**"* Pursuant to this statue, the board first had the duty to declare me delinquent and {thereupon} they had the duty to hold a parole court hearing as soon as practical. Because the board willfully failed to perform their duties, they "deprived me of my rights under the color of state law." **18 U.S.C.S. § 242**. This action on part of the persons in this complaint was also an action, which was a "*conspiracy against my rights to deprive me of my liberty & freedoms.* " **18 U.S.C.S. § 241**. The parole court hearing held by agent Graham and agent

4

Bill on September 18, 2001, was unauthorized by statue. **Title § 15-22-32**. See (Exhibit-3). That hearing was unauthorized, because the parole board had the duty to first declare me delinquent before the parole court hearing could be held, pursuant to **Title §15-22-32.** This action did not occur. At least not until the hearing had already been held and agent Bill & Graham had recommended to the board to revoke my parole. I was declared delinquent by the board on October 1, 2001. The hearing was held thirteen days before I was declared delinquent. This makes the hearing illegal. Alabama legislature addressed illegal actions by the parole board in **Title § 15-22-40,** which states: " *Any order made contrary to the provisions of this article shall be null and void and shall have no force or effect. "* By statutory law the illegal action on the part of agents Bill and Graham holding the hearing prior to me being declared delinquent by the board is deemed null & void and shall have no force or effect. When the board revoked my parole on October 23, 2001, relying upon that illegal / unauthorized hearing, they exceeded their jurisdictional authority and arbitrarily and capriciously deprived me of my liberty, freedoms and privileges which are granted to me through the United states constitution, Alabama constitution 1901 as administrated through constitutional statutory provision **§ 15-22-32.** They have violated in their administration of justice. Their action is deemed null & void and has no force or effect to hold me within confinement of the prison system. I am due my release. Furthermore, when the board willfully revoked my parole on a parole court hearing held prior to be being declared delinquent that action alone is contrary to statutory provision **§ 15-22-32**, however, when the board did declare me delinquent on October 1, 2001 (Exhibit-4), they had the duty to hold a hearing on the declaration of delinquency. See (Exhibit-4) which states: " *TO THE DEPARTMENT OF CORRECTIONS: Robert Earl Ray, Jr. #136712 who has heretofore been paroled, having this day been **declared delinquent**, you are directed to take said parolee into custody pending revocation hearing. "* Since the board had declared me delinquent it has been six years and four months and the board has not

held the legal revocation hearing on the charged offense in the parole violation report dating back to 9/10/01. The result of them not holding the revocation hearing after they declared me delinquent is another manifest injustice. An illegal incarceration. A period of time that they cannot be tolled. A period that cannot be excused. I have been held in their custody for a gross period of time which is contrary to statutory provision **§15-22-32,** which states in part: "*[**Thereupon**], the board, a single member of the board, a parole revocation hearing officer, or a designated parole officer* ***shall, as soon as practical, hold a parole court.***" Six years and four months is not considered "*as soon as practical.*" The original charged offense of Domestic violence was dismissed by the Honorable Don Mansell on November 15, 2001. There was no other reason why the board could not hold the hearing. It's obvious their illegal and unauthorized actions is a conspiracy that has deprived me of my rights, freedoms and privileges granted to me by the U.S. constitution and Alabama constitution 1901, pursuant to **18 U.S.C. § 241 & 242.** I recently raised these issues in the Montgomery circuit court before the Honorable Charles Price, presiding judge and he denied me any relief on a mandamus petition, by adopting the parole boards position that my claims were barred from review due to res judicata. I objected and stated that res judicata does not apply to knowingly and willfully illegal acts by the board contrary to statutory law. I argued that the board has the duty and I have the entitled right for them to perform the duty on my behalf. The court denied me review. I claim that the board still has this enjoined duty imposed upon them and they cannot let this duty run like water of their backs. The law is clear that the statutory provisions are mandatory and they are to be strictly construed. **Title §15-22-38.** I have asked the state court and the board to deem their illegal actions null & void and order that their illegal actions have no force or effect in which statutory provision §15-22-40 demands. I have been denied relief. I will now show to the court why the agents of the parole board held the illegal hearing and why they have failed to hold a hearing since I was declared delinquent on October 1, 2001. On September 18,

2001, the day of the hearing. I had several witnesses present to testify at my hearing. They were present and available. See (Exhibit-3 (b) Para. #1). Officer Bill documented in his report that I denied or refused calling my witnesses. This information is false and erroneous and unsupported by any evidence in the record (his report). See (exhibit-3 (a))-"*Evidence Received.*" There is not a single statement in the evidence-received report that supports his conclusion that I denied a single witness. There is no waiver signed by me. This was the hearing officers way of denying and suppressing the evidence that my witnesses were present and ready to present testimony on my behalf. When he denied my witnesses, he denied me my right to protect myself or defend against the allegations against me in the parole violation report. A denial of due process. Although my due process was denied I now argue this only to show the court that a conspiracy against my rights have occurred and this action has resulted in my illegal incarceration. Agents Bill and Graham knew that my witnesses were going to present viable, prima facie evidence that I did not violate any condition of my parole and that T.C. Bill & Marty Bruce Graham did conspire with the allege victim to send me to prison by depriving me of my liberty illegally. I now present witness number one who was present and available and this is what she would have testified under oath and she would have supported her testimony with tape recordings.

    1. MRS. BRENDA OLIVER: would have testified under oath that parole officer Bill had previously met with the alleged victim Ms. Davilla in Huntsville at his office. That he had conspired and  agreed with Ms. davilla to send me back to prison for five years. Mrs. Oliver's testimony would have been supported by a tape recording wherein she recorded Ms. davilla, when she called Mrs. Oliver to tell her about the meeting she had with Mr. Bill. See (Exhibit-6).

affidavit by Mrs. Brenda Oliver.

2. **The tape-recorded evidence**- proved that agent Bill & Ms. Davilla agreed to meet and conspired with intent to violate my constitutional right to remain at liberty on parole without violating the law. Agent Bill promised Ms. Davilla that he would send me to prison for five years and she promised to testify against me. This is a conspiracy. The meeting between agent Bill & Ms. Davilla is a violation of my fifth & fourteenth amendment right. The reason being is, agent Bill was the hearing officer over the allegations made by Ms. Davilla in the report of parole violation as filed by agent Graham. He was not a neutral or detached hearing officer. His meeting with the alleged victim prior to the hearing does more than frustrate the due process clause it violates. Furthermore, when agent Bill promised to send me to prison for five years before a hearing was held on September 18, 2001, proves his intent to conspire and violate my civil rights. Agent Bill would not allow my witness Ms. Oliver to testify or present the physical evidence in the parole court hearing on September 18, 2001, which proved the conspiracy. The board has since this time been informed of agent Bill's denial of my witnesses and his conspiracy to violate my civil rights. In fact, investigator Mike Feehan performed an investigation on these allegations and he received copies of the recordings for the boards review. They have turned a blind eye and a deaf ear to a clear manifest injustice. Ms. Oliver is willing and able to testify before this court and to present the tape recording for this courts review to establish any probable cause necessary to issue the warrants of arrest.

The allegations presented in agent Graham's parole violation report consisted of the following: See (Exhibit-2 (a)(b)).

**I.** Assaulted Ms. Davilla by "*hitting her in the eye, back, leg and head and burnt her with lit cigarettes and she reported and was treated for **all** of the injuries at Limestone Hospital.*" This is the allegation. This is what I prepared to defend. In the September 18, 2001,

hearing I presented the **[medical report]** from the Limestone Hospital. The report stated cause of injury: "*ran into door.*" See (Exhibit-*1*). The medical report does not support that she was assaulted by me or that she received other injuries as alleged by her in agent Graham's report. Matter of fact, Ms. Davilla testified in the parole court hearing "*she did not report any other injuries nor was she treated for any other injuries.*" See (Exhibit-3 (a) Para. 3 & 4). The only injury that I had to defend was the eye injury and she stated under oath, "I hit her in the eye." See (Exhibit-3 (a)). The medical report proves that not to be true. Ms. Davilla then states: "*she lied to the doctor about how she injured her eye*" (Exhibit-3 (a)). I then presented a **[tape –recording]** in the hearing. In (Exhibit-3 (a)) hearing officer Bill states: "*I submitted a tape recording on the form of a tape measure that records.*" Then (Exhibit-3 (b) Para. #3) he states: "*Ray wanted the hearing officer to listen to a tape recording in the gift of a tape measure. <u>The hearing officer could hear Ms. Davilla ask her children [Jonathan] to tell how she got the eye injury. A Childs voice could be heard saying that she dropped a towel and hit her eye on a door as she came up from picking up the towel.</u>*" Both agents Graham & Bill after listening to the tape –recording that I presented in the form of a tape measure. They both suppressed part of the recording. They did this by intentionally removing part of the recorded evidence from being in the hearing officers report to the parole board. The small portion of the recording as stated above [the underlined part] by the hearing officer is far from being the full content of the recording.[ I]f both agents had put the full content of the recording into their report to the parole board for their review, they could not have recommended that my parole be revoked as they did and as they had agreed and conspired and as promised to Ms. Davilla in their meeting prior to the parole court hearing. See (Exhibit-). See affidavit from **[James Oliver]** who is in possession of the above-mentioned tape recording. See (Exhibit-*8*). He under the penalty of perjury presents that the following is the full content of the recording as presented in the parole court hearing on September 18, 2001.

# FULL CONTENT
# OF TAPE-RECORDING

Robert asked Lorena: "*what happened to your eye*? Lorena responds: " *I bent down to pick a towel up and hit my eye on the door, that's the truth. Jonathan tell Robert what I told you when I came in your room with the towel. Hit eye on the door."*

As it can be clearly ascertained that the portion of the recording that was suppressed is the following:

Robert asked Lorena: "*what happened to your eye*? Lorena responds: " *I bent down to pick a towel up and hit my eye on the door, that's the truth.*

Let the record reflect that Lorena who Mr. Oliver refers to is Ms. Lorena Davilla. The alleged victim.

# WHAT DOES THE PART OF THE RECORDING SUPPRESSED PROVE
# AND WHY DID AGENT BILL LEAVE IT OUT OF HIS REPORT?

1. It shows that I [Ray] was doing the recording and asking Ms. Davilla how her eye injury occurred.

2. It proves Ms. Davilla did hit her eye on a door. This was her own answer to the imposed question from me on how she hurt her eye.

3. She stated: "*that's the truth.*" That she hit her eye on a door.

4. It proves that I did not cause her injury.

5. It proves that her injury was an accident by hitting her eye on a door not a criminal act as she alleged.

6. It shows that she is telling me how she injured her eye. If I was the cause of her injury show would not tell me how she injured her eye on a door.

7. It shows that the reason that she gave to the hospital how she injured her eye is the same in this recording to me. *"ran into door." "hit eye on door."*

8. It shows that the same reason she gave to the hospital and that she gave to her children she also gave the same answer to me.

9. She previously stated that she lied to the doctor how she injured her eye. That I actually caused the injury. She stated that she lied to her children how she injured her eye. Let the record reflect that the same reason she gave to her children the hospital is the same reason she gave to me.

The parole board has since this hearing heard the tape recording. Investigator Mike Feehan made a copy of the recording and the board has received the copy from him. Steve Sirmon & Ann Cargo listened to the recording on November 9, 2006 at the parole agency. They are well aware that the tape recording exists and they are aware that agents Bill & Graham suppressed part of the recorded evidence. The board has a duty enjoined upon them to correct any unauthorized or illegal actions by the board. In this case, they have willfully conspired with both agents Bill & graham to protect them from being exposed. Their acts, or failure to act, and practices described herein and complained of constitutes dereliction of duty, misfeasance, malfeasance, nonfeasance and a gross abuse of discretionary power resulting in actual injury to me in violation of statutory law and my civil rights**. Malloy V. Barfoot**, 608 so 2d 402 (court of civil app.) When the tape recording was presented and played in the parole court hearing. Ms. Davilla was shocked. She did not object, refute or rebut. She gave no further testimony in regards to the presented evidence and nothing was placed in agent Bill's report about the recording other than what I have already presented. In fact, they dismissed her from the room immediately. Agent bill in his official capacity has under oath committed perjury in violation of § 18 U.S.C.S. 1621, when he intentionally stated in his

Stated in his report that I denied calling my witnesses. He presented no evidence to support that statement. A review of the record, in camera will show that there is no evidence to support his position on the matter. Furthermore, when agent Bill stated: *He could hear Ms. Davilla ask her children to tell how she got the eye injury. A childs voice could be heard saying that she dropped a towel and hit her eye on a door as she came up from picking up the towel."* (Exhibit-3 (b) Para. #3). He leading the board to believe that was the full content of the recording. All of the evidence. This is an intentional false statement under his *"oath of office"* const. Of Alabama 1901, Article XVI sec. 279 and title § 15-22-20 (d). He used his office to intentionally conceal and mislead others.

**II.**     Agent Marty Bruce Graham the investigating parole officer and my assigned parole officer whom prepared the parole violation report, was unfair in his investigation of the allegations, which was his duty imposed upon him pursuant to the articles of the parole board 2001. See Article __11 ,2001__.

Agent Graham had failed to perform his investigation on the allegations. He failed to present his investigation in the parole court hearing on September 18, 2001. He presented no testimony or any evidence to support the allegation in his report. Why, did he fail to perform his duty? This question is answered by a certified copy of a transcript record in the Limestone county court, wherein agent Graham testified under oath that he initiated a dating relationship with my girlfriend, the alleged victim. See (Exhibit-7). Later two eye witnesses saw agent Graham and Ms. Davilla celebrate my incarceration and their victory by a party of drinking and having sexual relations. See Affidavits from Kelly Adams & Louis Lopez. (Exhibit6-8).

12

There are other tape recording that are in the possession of Mr. & Mrs Oliver who tape recorded Ms. Davilla on the phone and told her that she was being tape recorded. In this tape recording, Ms. Davilla explains how agent graham was Robert's worse enemy and that she could get him into a lot of trouble because he showed her many personal records on his computer that could get him fired. Ms. Davilla has contacted my family and told them she will testify concerning this information, however she needed to be suspended and protected from Agents Bill & Graham, because they threatened to prosecute her for committing perjury under oath in the revocation hearing. This type of action must be addressed and Ms. Davilla must be protected from any injury forced upon her for testifying. The parole agency received copies of these tape recordings through investigator Mike feehan around March of 2007. They have knowledge of theses acts and have refused to take any steps to correct such manifest injustice.

**III.**    On November 9, 2006 the following persons met with two designees of the parole agency { **Steve Sirmon**, attorney & **Ann Cargo**, Dir. Of field Services} in regards to my illegal incarceration and the acts and omission described in this complaint.

1. James Houston Oliver

2. Brenda Joyce Oliver

3. Jaime Denise Yarbrough

4. Kelly Adams

5. Louis Lopez

They listened to the tape recordings. **Louis Lopez** testified that same day, that he was the person who actually assaulted Ms. Davilla, his cousin, not Robert Ray. He explains how

13

he performed these acts and when these acts were performed. See (Exhibit-12). **Jaime Denise Yarbrough** presented the tape-recording which was presented in the revocation hearing and they heard the full content of the recording. It proved to them that agent Bill & Graham concealed evidence of that recording which proved my actual innocence. See (Exhibit-13). The board took no action.

IV.    On April 30, 2007, the parole board denied granting me parole again and reset my next parole consideration for five years 2012. This did this in light of all the evidence knowing that they have the duty and authority to correct such manifest injustice before them.

I am not educated in the law. I do know that they have a duty to perform, they have failed to perform that duty on my behalf, and as a result, my liberty and freedoms which I enjoyed have been deprived of me illegally and in violation of my civil rights. Since this time my parental rights to my youngest son have been terminated due to the revocation of my parole and the board knows this and willfully fails to correct their actions which have led me to an illegal incarceration.

I am certain that the constitution of the United States recognizes me as a person. I still possession my constitutional & Civil rights. I do realize that my conviction of murder & robbery dating back to 1981 will perhaps make any person not want to consider helping me, and the fact that these persons named in this complaint are citizens with outstanding achievements and accomplishments in society. I take this opportunity to share with you, who I am. I was the first to my knowledge to be certified as an adult in Alabama at the age of 15. This is what I have been told. I was sentenced to 18 years for

murder and 15 years for robbery, by the court and this showed his leniency upon my life. I took advantage of this leniency. I earned my G.E.D. in 1984 in prison at J.F.I technical college. The same year my class graduated in society. I graduated a block & Brick mason trade in 1984, the same college. I participated in every known drug program, mental health program that the prison system offered. In 1988, I was married in prison to a beautiful wife, my high school girlfriend. That same year I was chosen by John Hale,[prison spokes person] to be a part of a state wide drug program called "free by choice." In 1988 or 89 I was interviewed by 48 hours international T.V. program at the Limestone correctional facility under Warden J.D. White. I was considered the most rehabilitative inmate in the state of Alabama. The program was aired on T.V. Thereafter, Our Governor; Guy Hunt invited me to be his speaker during the red Ribbon campaign at the Governors mansion. I spoke that day and eventually spoke at Wallace State University and Montgomery coliseum for the governor's office. A short while latter I was sent to the state of Louisiana to establish the free by choice program in that state with the prison commissioner of their department of corrections. I have served my sentence now in 16 different prisons through out the state of Alabama, Mississippi & Louisiana. During the entirety of my incarceration a total of 24 years and six months. I have no been in one altercation. I have not received any disciplinarians or citations. My incarceration has been impeccable. Some would say that I beat the system. I do not see things this way; rather, I have set the bar high for any inmate who wishes to live above the life-style of the convicted criminal. I have proven that it is possible to do the right thing in a bad place. I have conformed to a life of discipline and demonstrated that one can walk the straight and the narrow. Upon my return to prison on my parole being revoked, I have set the

15

same standard. The only problem that I have had since 1981, is my relationship with Ms. Davilla and the fact that my parole officer Marty Bruce Graham, hates me with a passion and he sought an avenue to send me back to prison on a conspiracy through both Ms. Davilla and T.C. Bill. How do I know this? In 1988, after marrying my wife. She asked me on the visitation yard, did I know a person by the name of Bruce Graham. I stated no, thinking inmate. She later realized that and said he was a prison guard. I told her I had seen him around, by the description that she gave. I asked, what is your concern about him? She told me that he and her sister was engaged and that she did not want them to get married. She asked me was he a drug addict or a drug dealer or was he a gay person? I told her that I knew nothing about him at all. About four years after I was released on parole, I moved back to Limestone County and Bruce Graham became my parole officer, but I did not recognize him at all. He made me sit in his office and he asked me did I know him? I stated no. He began to explain that his interest was to send me back to prison as soon as possible that I ruined his life. I asked how did I do this. He said I was engaged to your ex-wife's sister Shelia. We were about to be married but you told your wife that I was a drug dealer and gay. I firmly told him that was not true. Everything came back to me at that moment and I told him that my Ex-wife Barbara Denise Lankster had made that story up to keep her sister from marrying you. I told him that she asked me about him, but I did not know you. He did not believe. I called Barbara to his office and she explained that she used name to make her sister believe her lie. Agent Graham accomplished his goal and I am now suffering from a lie that my ex-wife told me. I said this to ask that you will consider me as the person that I am, not as I was convicted in 1981. I am worth helping. This type of action must stop in that agency. Alabama

legislature initiated an investigation on the parole board in 1949 on allegations of corruption. In 1951, the evidence was so shocking to society that title 15 was created to control the actions of the parole agents and to establish their duties and how they must be performed. See **Ellard V. state,** 474 so 2d 743, aff' **Ex parte, Ellard**, 474 so 2d 758.

Legislature in its construction of title 15-22-38 affirmed that the statues of title 15 are mandatory and must be strictly construed and that 15-22-39- they are subject to criminal sanctions if they willfully fail to perform their duties as laid out in title 15. This is what the persons in this complaint have done. They have willfully violated title 15 to deprive me of my liberty and freedoms afforded to me through the Alabama & U.S. constitution. They are to be held accountable and I am entitled to relief.

Done on this the 25th day of January 2008.

ROBERT EARL RAY, JR.

### *S W O R N   A F F I D A V I T*

I, Robert Earl Ray, Jr. hereby under the penalty of perjury that the above-mentioned facts alleged in the petition are true and correct to the best of my knowledge. I am competent and in my right mind. I am over the age of 21 and a resident of Alabama, specifically the Limestone Correctional facility.

1. That the parole board denied me my release since 2001 even when I brought to their attention that they have violated both state & federal laws.

2. That agents Graham & Bill named in the complaint have violated statutory law § 15-22-32, my constitutional and civil rights, when they held a parole court hearing on September 18, 2001 before I was declared delinquent by the board, October 1, 2001.

3. That the parole members named in the complaint violated statutory law § 15-22-32 and my civil rights when they revoked my parole on an unauthorized hearing held contrary to statutory provision §15-22-32 and pursuant to title § 15-22-39 they are subject to state criminal sanctions.

4. That the board has deprived me of my liberty for six years and three months knowingly on an unauthorized and illegal hearing held contrary to statutory provision and therefore, violating my civil rights and are subject to criminal sanctions under 18 U.S.C.S. § 241 & 242.

5. That the persons named in the complaint have willfully neglected to hold a parole revocation hearing on the declaration of delinquency for six years and four months . This action is in violation of statutory provision §15-22-32 and 18 U.S.C.S. § 241 & 242-Deprivation of rights under color of state law through a conspiracy to deprive me of my rights guaranteed me through the United states constitution and the Alabama Constitution 1901.

6. The persons named in the complaint have knowledge that both parole agents **T.C. Bill & Marty Bruce Graham** have conspired against me to illegally deprive me of my rights, by using knowingly false and perjured testimony of Ms. Lorena Cazares Davilla.

7. The persons named in this complaint have knowledge that agents Bill & Graham have suppressed evidence of a tape recording presented by me in the parole court hearing on September 18, 2001, which proves my actual innocence. This knowledge invokes a duty upon them to correct any illegal actions which may result in a clear manifest injustice. This suppression was a conspiracy to deprive me of my rights guaranteed me through the United states constitution and Alabama constitution 1901. This subjects them to criminal prosecution under 18 U.S.C. § 241 & 242.

8. **Johnnie Johnson & Nancy McCreary** were the two parole board members who revoked my parole relying on an unauthorized / illegal hearing held on September 18, 2001. This action by them was willful and a conspiracy to violate my civil rights and they are subject to criminal prosecution under both §15-22-39 & 18 U.S.C. § 241& 242.

9. Cynthia Dillard, executive director of the parole agency initiated an investigation from the parole agency upon allegations presented to the board of corruption. The investigator assigned to the case was Mike Feehan. Mr. Feehan questioned Brenda Oliver, James Oliver, Jaime Denise Yarbrough, Kelly Adams, Louis Lopez, Lorena Davila, T.C. Bill and Marty Bruce Graham. He made copies of all tape recordings mentioned in the complaint and those findings were given to Ms. Dillard and then to the board to my understanding. She has knowledge that I am actually innocent and she has evidence to support such a claim. Ms. Dillard has failed to perform or order the board to perform their duties to correct their illegal action in revoking my parole. Her failure to make the board perform their duties pursuant to title §15-22-40 she is subject to criminal sanctions under §15-22-39 and 18 U.S.C.S. § 241 & 242.

10. Board Members *William Wynn, Velinda Weatherly, Robert Longshore* have been informed of the illegal incarceration based upon actions contrary to statutory provision §15-22-32 and they refused to hear any testimony or tape recordings as presented to the board on April 30,

2007. Instead they denied granting me parole and set me off on parole until 2012. They are subject to criminal sanction under §15-22-39 and 18 U.S.C.S. § 241 & 242.

11. The board has knowledge that Louis Lopez came forward and testified on November 9, 2006, that he was the person who caused the injuries to Ms. Davilla. Based upon this knowledge they have failed to correct the illegal action in revoking my parole. This failure and neglect now subjects them to criminal sanctions under §15-22-39 and 18 U.S.C.S § 241& 242.

12. Ms Kelly Adams & Louis Lopez testified before Ann Cargo & Steve Sirmon that they witnessed agent Graham and Ms. Davilla celebrate my illegal incarceration and had sexual relations.

13. Mr James Oliver has the tape recording ion his possession which was presented in the revocation hearing.

14. Mrs. Brenda Oliver has the tape recordings in her possession in which show that agent Bill and Ms. Davilla met prior to the parole court hearing, and he conspired and agreed to send me to prison for five years before the hearing occurred.

Done on this the 25th day of January 2008.

ROBERT EARL RAY, JR.

Sworn to and subscribed before me on this the 25th day of January 2008.

NOTARY                    MY COMM. EXPIRES          ROBERT EARL RAY, JR.
                          9-28-11



Robert Earl Ray, Jr. #13
Limestone Corr. Facility
28779 Nick Davis Rd.
Harvest, AL. 35749

UNITED STATES POSTAGE
$ 00.82
02 1A
0004355531
MAILED FROM ZIP CODE 35749
FEB 04 2008

HARVEST AL 35749
FEB

Air Mail

United States District Court
TO: mark E. Fuller
Middle District of Alabama
P.O. Box 711
Montgomery, AL. 36101-0711

This correspondence is forwarded from
an Alabama State Prision. The contents
have not been evaluated, and the Alabama
Department of Corrections in not
responsible for the substance or content
of the enclosed communication.

7003 1010 0001 7104 4834



**State Board of Pardons and Paroles**

Montgomery, Alabama

# Certificate of Parole

KNOW ALL MEN BY THESE PRESENTS:

It having been made to appear to the Alabama State Board of Pardons and Paroles that

RAY, ROBERT EARL JR     136712

is eligible to be PAROLED, and that there is a reasonable probability that said prisoner WILL REMAIN AT LIBERTY WITHOUT VIOLATING THE LAWS, and it being the opinion of the said State Board of Pardons and Paroles that the release of this prisoner is not incompatible with the welfare of society, and it appearing further that the Board is satisfied that this prisoner will not become a public charge on release, but will be suitably employed at _____

CAROL'S CARPETS, 1640-A N. E. BYPASS, MONTGOMERY, AL

and will live at     14691 HOLTVILLE RD, DEATSVILLE, AL

and shall continue in the same until he obtains the permission of his Parole Officer to make a change. He shall go directly to     WETUMPKA     and report immediately upon arrival to his Parole Officer at     100 COMMERCE STREET, #203

It is therefore ORDERED that said prisoner be, and is, hereby paroled pending good behavior under supervision subject to the specific conditions of parole listed on the reverse side of this Order.

In witness whereof this Certificate bearing the seal of the State Board of Pardons and Paroles is issued this the     2ND     day of     FEBRUARY     19 94

By Order of:

STATE BOARD OF PARDONS AND PAROLES

_____
Executive Director

**EXHIBIT 1 (A)**

## STATEMENT OF CONDITIONS UNDER WHICH PAROLE IS GRANTED

This Certificate of Parole shall not become operative until the following conditions are agreed to by the prisoner. Violations of any of these conditions may result in revocation of Parole.

1. I shall report immediately by a personal visit to the parole office under whose supervision I am paroled.

2. I shall not change my residence nor employment nor leave the State without first getting consent of my parole officer.

3. I shall between the first and third days of each month, until my final release from parole, make a full and truthful report to my parole officer in writing.

4. I shall pay $_____ restitution and any preexisting restitution. Payment in full will be certified by the circuit clerk.

5. I shall properly and truthfully answer all inquiries directed to me by the State Board of Pardons and Paroles and my parole officer and allow that officer to visit me at my home, employment site or elsewhere and carry out all instructions my parole officer gives including assignments to any level of supervision. I will make myself available for searches and tests when ordered by my parole officer, including but not limited to, urinalysis, breathalizer and blood samples, and/or search of my residence, vehicle or any property under my control.

6. I agree to waive all extradition rights and process and agree to return when the State Board of Pardons and Paroles directs at any time before my release from parole.

7. I shall not violate any law.

8. I will immediately upon the release from the service of the sentence in _____ if prior to _____, report directly to the State Board of Pardons and Paroles, 50 North Ripley Street, Plaza Level, Gordon Persons Building, Montgomery, AL 36130, either by telephone, (205) 242-8700, correspondence or in person.

9. I agree to pay $20 per month to the State Board of Pardons and Paroles as required by law, or if I am placed in Intensive Supervision, I will pay $15 per week so long as I am in the Intensive Supervision program.

10. I shall not own, possess or have under my control a firearm or ammunition of any kind, nor any other deadly weapon or dangerous instrument as defined by Alabama law.

11. I understand that parole is a privilege and not a right. The Board may modify these conditions as necessary and may revoke my parole at any time my continued release is detrimental to my health and safety or to the welfare of society.

12. ☒ If checked — No alcohol

13. ☒ If checked — I will attend NA-AA or other substance abuse aftercare program a minimum of one (1) time per week.

14. Special Conditions:

SUCCESSFULLY COMPLETE - SPACKMAN'S PROGRAM

I hereby certify that this Statement of Conditions of Parole have been read and explained to the Parolee.

This _____ day of _____ 19 ____

**EXHIBIT**

**1 (6)**

_____          _____
Warden or Deputy Warden                    Signature of Parolee

STATE BOARD OF PARDONS AND PAROLES

Montgomery, Alabama

REPORT OF PAROLE VIOLATION

Date: __September 10, 2001__

Field Office: _____Athens_____

RECEIVED

SEP 1 7 2001

State Board of
Pardons and Paroles

Name of Parolee  RAY, Robert Earl, Jr.           No.        136712

Race, Sex & Age _WM_  DOB: 11/26/65  35 yrs  County of Conviction _Jefferson_

Offense _Robbery I  Murder_  Sentence _15 yrs and 18 yrs respectively  (consecutively)_

Date Convicted _12/8/83_          Date of Parole _2/2/94_

Date Sentence Expires ____11/3/2016_____

IF DECLARED DELINQUENT, FORWARD WARRANT TO:  M. Bruce Graham
                                              Parole Officer

                                              Limestone
                                              County Probation Office

                III                           1109 W. Market St., Suite D
Supervision Level at time of Delinquency      P.O. Box or Number and Street

                                              Athens, AL  35611
                                              City, State and Zip Code

CHARGE NO. 1
VIOLATION OF CONDITION NO. 7.
NEW ARREST-ASSAULT III (DOMESTIC VIOLENCE)

LEGAL FACTS:

On 9/7/01, Ray was arrested and charged with Assault III by the Athens, Alabama
Police Department. He is presently incarcerated at the Athens city jail. A parole
officer's authorization of arrest "hold" was issued pending parole board action.

DETAILS:

On 8/25/01, Ms. Larena Davila reported to the Athens Police Department that she
and Robert Earl Ray, Jr. had gotten into an argument. Ms. Davila and Ray were once
in a girlfriend/boyfriend relationship. Ms. Davila reported that Ray struck her with
his fist in the torso, legs, and head. She stated and continued to have a blackened
left eye. Ms. Davila stated that Ray had intentionally poured hot coffee on her and
burned her legs with lit cigarettes numerous times prior to her filing the police
report. Ms. Davila sought and received medical attention due to these injuries. At

PB Form 109 (Rev. 5-92)


EXHIBIT
2(A)

RAY, Robert Earl, Jr.    PAROLE VIOLATION
WM DOB: 11/26/65

the time of Ms. Davila's report, Officer Fred Millward observed several bruises on Ms. Davila's legs, back, and left arm. Ms. Davila reports that Robert Ray threatened her life if she reported him assaulting her. A warrant was issued for Ray's arrest. On 9/7/01, this warrant was executed. Robert Earl Ray, Jr., is charged with Assault III.

* Ms. Davila reported that Ray has stolen money from her. Ray has yet to be charged.

RECOMMENDATIONS:

This is the second report filed by this writer concerning Ray's assaultive behavior toward Ms. Davila. The first parole violation report is dated 10/27/00. It is recommended that a fugitive warrant be issued for Ray's arrest. It is recommended that a parole revocation hearing be conducted to determine if there is sufficient evidence to revoke Robert Earl Ray's parole.

Signed and dated at Athens, Alabama this the 10th day of September, 2001.

M. Bruce Graham
Alabama Probation & Parole
Officer

MBG/mbg

Reviewed _____ Date 9-18-01
T.C. Bill
District Supervisor

9-19-01

Exh-2(6,

2

# BOARD OF PARDONS AND PAROLES
# PAROLE COURT HEARING

| | | |
|---|---|---|
| DATE: 9-18-01 | LOCATION: | Limestone County Jail |
| PAROLEE: Robert Earl Ray, Jr. | NUMBER: | 136712 |

HEARING OFFICER:    T. C. Bill

CHARGE NUMBER:    1                    PAROLE CONDITION NUMBER:    7

THE PAROLEE:    ☐ ADMITS    THAT THIS CONDITION OF PAROLE HAS BEEN VIOLATED.
                ☒ DENIES

## WITNESSES

THE FOLLOWING WERE HEARD AS WITNESSES AFTER ANSWERING AFFIRMATIVELY TO:

"DO YOU SWEAR OR AFFIRM THAT YOU WILL TELL THE TRUTH IN THIS HEARING?"

1.  Name/Title:    Larena Davila, victim

2.  Name/Title :    Officer Fred Millward, Athens Police Department

3.  Name/Title :    Robert Ray, parolee

## STATEMENT OF THE EVIDENCE RECEIVED
(use attachment if necessary)

*Exh-3*
*(A)*

Assault III, Domestic Violence

Officer Millward said that he responded to an unspecified call to Davila's residence at about 11:50 a.m. 8-25-01. When he arrived there, he saw that Davila had a bruise to her left eye, on her right arm and thigh. He questioned her and left to file his report. In answer to a question from Mr. Powell, the Officer said that Ray was not there at the time he was at the home. The Officer said that some children were at the residence, and he said that Davila said that she got the bruises on 8-17-01, not on 8-25-01.

Ms. Larena Davila testified next, and she said that she and Ray had argued, and he hit her. She did not recall the exact date. She said that she did not call the police for a week, and she called on 8-25 because some money was missing. That was what she wanted to report, and the Officer saw the bruises and asked her about them. She answered a number of questions from Mr. Powell.

She had said that a doorknob caused the bruises. She said that she was not jealous of the landlady of an apartment complex. She called the police about the missing money. She admitted that she had told her children a lie about the bruised eye because they were children. She went to the hospital because her eye hurt and was swollen shut. As she recalls, she went to the hospital the following day, 8-18-01. She admitted that she told the people at the hospital that she had gotten the injury from a doorknob. She did not list any other injuries except the eye. She admitted that she had made false statements a year ago, had accused Ray of assaulting her and had not testified. In fact she had eventually said that she had lied about the injuries a year ago. She insisted she did so because Ray promised that he would not harm her again.

Mr. Powell continued to question Ms. Davila. She said that she did not call an apartment manager and report that Ray was a convicted felon. She denied harassing Ray. She said that she had told a friend about the burns and the hot coffee. She said that she did not report the bruises and had not gotten treatment for them. She said that their argument had been on 8-17, and they had argued about a girdle. She said that she had not accused him of seeing another woman, and they had not argued about that. She admitted that it would upset her if Ray were seeing another woman. She admitted that she had gone to his apartment to give him a gift of a tape measure that records, has a small, built-in tape recorder. She did not recall being told that she was not welcome at the apartment. She said that she had not been threatened about testifying at the Hearing. She said that she had asked

Ray to move in with her. He had slept over night at her residence but had not moved in. She said that he had no bought prescription medications for her. She had not gotten the bruises on the job. She did not get the eye injury from a bedpost or a doorknob, but she did tell her kids that. She was afraid of Ray at times. She said that she had not seen Ray since the 18th of August. Under questioning, she did say that he had come by. they had slept together, and she had called him. She said that she did not ask him over, he would just stop by.

The questioning from Mr. Powell continued. She said that she got a patch for the eye and nothing for pain. She said that Ray had not bought any drugs for her. She said that he did not baby sit her kids after her eye injury. Ray did take her children to a fast food restaurant while she was at the hospital. Her son was hungry. They went and came back. She insisted that she did tell the doctor about the assault but she asked him not to put it in the report and not to say anything about it because Ray was at the hospital.

Ray answered some questions from Mr. Powell. He wanted the Hearing Officer to listen to a tape recording on the gift tape measure. The Hearing Officer could hear Ms. Davila ask her children to tell how she got the eye injury. A child's voice could be heard saying that she had dropped a towel and hit her eye on a door as she came up from picking up the towel. Ray said the he did not hit her.

Mr. Powell gave the Hearing Officer the hospital reports, and the Hearing Officer said that he would read them before reaching a decision about the charge.

Ray made a lengthy statement. He said that Davila thought he was seeing another woman. so she had fabricated the story about the eye and bruises. She was raised in an abusive family. She had lied on him the first time. and she was doing it again. He said that he was not cheating on her. He said that he does maintenance work at two complexes. and he lives in an apartment at one of them. He said that he knows that she called his bosses and told them he is a murderer and robber because of Star 69. Caller ID indicated that the calls came from Davila's work phone number. He had not been fired. She has a green card. She gets very excited and has mood and behavior swings. She is on anti-depressant medications. She has assaulted him in the past. including giving him a bloody nose.

er 8-18. he has visited with her. He has spent the night. They have had sex. He has played with her children. They have had no other disagreements. He does not know why she waited a week before reporting the assault. He was busy and needed to work. She had asked him to move in with her. to help her financially. but he has not done so because of the fights they have had in the past.

He has a job and a place to live. He wants to be reinstated to parole.

## HEARING OFFICER'S FINDINGS

☒    I FIND THAT THE PAROLEE IS GUILTY OF THIS CHARGE OF PAROLE VIOLATION.

☐    I FIND THAT THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THIS CHARGE OF PAROLE VIOLATION.

Signed: _____    Date: September 20, 2001
Parole Court Hearing Officer

Distribution:    Original - Board
                 Copy - File
                 Copy - Parolee

PB Form 104A (REV. 9-99)

$Exh$-3(b)

# STATE OF ALABAMA

## BOARD OF PARDONS AND PAROLES
Montgomery, Alabama 36130

_10/01/01_
Date

## DECLARATION OF DELINQUENCY

TO THE DEPARTMENT OF CORRECTIONS:

_ROBERT EARL RAY JR._ NUMBER _136,712_

who has heretofore been paroled, having this day been declared delinquent, you are directed to take said parolee into custody pending revocation hearing.

VIOLATION OF CONDITION NUMBER:

_#7  ASSAULT III (DOMESTIC VIOLENCE)_

STATE BOARD OF PARDONS AND PAROLES

By: _David L. Parker_
Executive Director

Distribution:
Original - Bd. File
Field Office - ATHENS - GRAHAM
Dept. of Corrections
Control Book

III

CO Form 011 (Rev. 6-90)

EXHIBIT
4



# STATE OF ALABAMA
# BOARD OF PARDONS AND PAROLES

## ACTION OF THE BOARD SUBSEQUENT TO PAROLE COURT

PAROLEE: _____ Robert Earl Ray Jr. _____    AIS # 136,712

Parole Court was held before __ T. C. Bill _____, Hearing Officer, on 9/18/01 _____.
at _____ Athens _____, Alabama. The Hearing Officer has filed a Report and Recommendation, as required by statute, and this Board has reviewed the detailed statement of evidence, the findings, and the reasons supporting those findings, which were:

_____ **CHARGES PROVEN.** The Hearing Officer has determined that Charge(s) # _____ was/were proven to his reasonable satisfaction. His Report and Recommendation addressed the evidence of mitigating circumstances. as well as the evidence that conditions of parole were violated. The record further reflects that an acceptable parole plan is in place which offers the parolee a reasonable possibility of living and remaining at liberty without violating the law. It is, therefore, recommended that Parole be RE-INSTATED to a satisfactory program.

It is recommended that the following additional conditions be imposed to improve the likelihood that the parolee will remain at liberty without violating the law:

_____

_____

_____

X  **CHARGES PROVEN.** The Hearing Officer has determined that Charge(s) # _____ was/were proven to his reasonable satisfaction. His Report and Recommendation addressed the evidence of mitigating circumstances, as well as evidence that conditions of parole were violated. It is, therefore, recommended that parole be REVOKED in this case.

Comes now the Board of Pardons and Paroles at Open Public Meeting, and after considering all evidence from Parole Court. including any mitigating circumstances, orders:

BOARD INITIALS

_____ _____    Continued to  _11-15-01_    *Is there a attornts home*
                   (date)                      *plan away from Athens, Al.*

_____ _____    Taken under advisement

_____ _____    That parole be REVOKED and given further consideration in _10-06_ .

_____ _____    That parole be revoked since a satisfactory plan has not been submitted within a reasonable amount of time and for reasons addressed in parole court and given further consideration in _____.

_____ _____    That the order of delinquency is void and parolee is RE-INSTATED on parole with the following SPECIAL CONDITIONS: _____

_____

_____

_____

Distribution Date 10-25-01 to:

Original – Board File
        Office  Athens - Graham
DOC
ACJIC
Control Book
CO Form 013 – A (Rev. 10-99)

Chairman of the Board    10-23-01    Date

Member of the Board    10-23-01    Date

Member of the Board    _____    Date

EXHIBIT
5

## "Affidavit"

Ex - 6

I, **Brenda Joyce Oliver** a citizen and resident of 16218
Hunstville, Brownsferry Rd. Athens, Al. 35611.

Telephone No. (256) 232-7598

This affidavit is in regards to a conversation I ( Ms. Oliver)
had with Ms. Lorena Cazares Davilla concerning Robert Ray
being incarcerated in jail in Sept., 2001.

Ms. Davilla called me at my home from her cell phone number
(256) 874-8054. For the sake of record, I recorded the con-
versation and she began to discuss with me the following
contents of the recording :

" I didn't go through Bruce Graham this time. I went to what's
his name. He gave me a card, the fat man he was there that day.
I asked him(mr. T.C. Bill) would Robert have to serve the rest
of his parole time, and he said no.
Three (3) to Five (5) years is all he would get. His parole
would not be over until 2016. I (ms. Davilla) said that is
fourteen more years. I told them that I was being straight up
with them. You might think I'll go over and get him out. That
is what I told him ( T.C. Bill) over a week ago. I told him
to be honest with me, three (3) to Five (5) years maybe less. "

I, Brenda Oliver was to testify at Robert Ray's parole hearing
concerning this conversation, but I was never called, I was
there. I am writing this affidavit to support the contents of
the recording, until the recording itself can be presented to
the court.

What Ms. Davilla was saying to me, was that in the first
hearing in 2000, when she refused to testfy, because of her
perjured testimony, the hearing officer Mr. T. C. Bill had
gave her a card. This card must have been one of his personal
contact, if she needed him for any reason give him a call or
come and see him.

Ms. Davilla stated she went to Mr. T. C. Bill and not Mr. Graham
and he instructed her how to handle her situation and her
concern was how long Mr. Ray would stay in prison. T.C. Bill
stated no more than three to five years. She admitted doing this
only a week prior to our conversation, so Mr. Bill played a
major role helping Ms. Davilla achieve her goal and her promise
to (them) not him in this sentence was, she would not go get him
out.

This leads me to believe that Mr. Ray didn't have much of a chance
when he entered into his parole hearing esspecially when the

(2)

hearing officer and ms. Davilla and parole officer Mr. Graham
The other him that made the(them) she referred to.had prev-
iously arranged his return to prison and already made predetermined
decisions on how much time Mr. Ray would serve.

She assured him if this was done for her she would not get him
out or refuse to testfy at his hearing as she had previously
done.
As a public opinion and concern the way justice is to be carried
out, I express that this type of behavior is a simple misscarriage
of justice and very un-ethical and un-professinal for the
hearing officer to participate in counsel with the alledged
victim, especially when it is his discretinary authority that had
a major part of revocation of Mr. Ray's parole, and when his
pre-determined decision was based on false and erroneous infor-
mation.

<u>Certificate   of   Service</u>

I do certify that the following affidavit was sent to Mr. Robert
Ray and the contents are true and correct. That he may use this
in his preparation of his response to the Montgomery Circuit
court.If the court desires for me to testfy in open court I am
able and willing to do so as I was available in the parole Hearing.

Done this date: <u>1-29-03</u>          .
signature: <u>Brenda Davilla</u>

" <u>Notary Service</u> "

Sworn to and subscribed before me on this <u>29th</u> day of <u>Jan</u>,2003.
                                           31st
My commission exspires on <del>th</del> day of <u>Aug</u> , <u>2005</u>    .

Notary sinature: _____

2303
DAVILA LORENA
F-29  05/12/73
COLLINS KE/NO 1
A 1959

Ex-7

© 1995-97 E.S.C.  Circle positives, check normals, backslash (\) negatives.

02

**Athens - Limestone Hospital**
# EMERGENCY PHYSICIAN RECORD
Eye Problems   (3)

Name: _____

TIME SEEN: 1055    ROOM: 5 _____

chief complaint: (L) eye injury
started: _____

PAST HISTORY: __ negativ
__ prior eye injury __ glaucoma __
Endometriosis

__current and
associated
symptoms

√pain          __ foreign body sensation
__ photophobia  __ burning
__ matting      __ redness
__ decrsd vision __ swelling of eyelid
__ itching      __ diplopia

__RIGHT EYE    √LEFT EYE

Meds- √none / see NAS _____

Allergies: √NKDA _____

SIMILAR SYMPTOMS BEFORE?  √no __ yes __ see PHx

apparent injury?  __ no  √yes  __ possibly
How?     __ foreign body
(activity)
         __ chemical exposure
              washed eye(s) at scene? __YES __NO
              volume: _____
         __ welding arc exposu
         √direct trauma "ran into a door"

         __ contact lenses
              extended wear? __YES __NO

When?  √as above

Where?  √home __ work __ school

SEEN/TREATED BY A DOCTOR RECENTLY?  √no __ yes
(By Whom, When, Testing, Diagnosis, Treatment, Response) __ routine visit only

XRAYS: __ nml / NAD

PROCEDURES and PROGRESS:
local anesthesia: □ Tetracaine
intraoccular pressure:    RIGHT EYE ____ mm
                          LEFT EYE ____ mm
foreign body removal:
□ with cotton-tipped swab   □ with needle / burr drill
□ with irrigation
□ Morgan lens
□ cornea curettaged with corneal burr after removal of
   foreign body, because of residual material.
Remaining material after foreign body removal?
__ NO __ DEBRIS __ RUST-RING
irrigation: __ R / L eye(s) irrigated with ____ cc nml saline / RL
other _____

ROS:  √no recent illness
__ fever              __ nausea
__ muscle aches       __ vomiting
__ runny nose         __ abdominal pain
__ sore throat        __ headache
__ ear pain ( R / L )
__ cough
__ trouble breathing



I James Houston Oliver a citizen and resident of 16218 Huntsville Browns Ferry Road Athens,Alabama 35611.Telephone number being (256)232-7598

I hereby certify that the following information is true and accurate. I have in my possession a tape recording in the form of a (tape measure)This recording is a conversation between Mr.Robert Ray and Ms. Lorena Cazares,Davilla and her son Jonathan. This is the contents of the recording as follow.

"Robert asked Lorena what happened to her eye?"she respondes by saying"I bent down to pick a towel up and hit my eye on the door,"that's the truth."Jonathan tell "Robert what I told you when I came in your room with the towel"."Hit your eye on the door."This recording was presented in Mr.Robert Ray's parole revocation hearing on October18,2001 in the Limestone County Jail.

I'am writing this affidavit to support the contents or the information on the recorder.The recorder itself can be presented to the Court as evidence.

Done this _27th_ day of _January_ 2003

_James Houston Oliver_
 James Houston Oliver

Limestone County
Alabama

_Jimmy Swann_
 Notary Public

My Commission Expires 8-31-20__

IN THE CIRCUIT COURT FOR LIMESTONE COUNTY, ALABAMA

Robert Earl Ray, Jr.,

      Plaintiff,

    vs.                           Case Number  CV 98-399

Christopher Plumbing and
Electric,

      Defendant.

\* \* \* \* \* \* \* \* \* \*

BEFORE:

      Honorable James W. Woodroof.
        Athens, Alabama, on Thursday, April 25, 2002;
      commencing at approximately 9:00 A.M.

APPEARANCES:

      FOR THE PLAINTIFF:

         Honorable J. Barton Warren
         100 Jefferson Street
         Huntsville, Alabama  35801

      FOR THE DEFENDANT:

         Honorable John A. Wilmer
         100 Washington Street
         Huntsville, Alabama  35801

              RIGEANA L. GENTRY
            OFFICIAL COURT REPORTER

MR. WILMER:      We call Bruce Graham.

(Witness Sworn.)

M. BRUCE GRAHAM,

was sworn and testified as follows;

DIRECT EXAMINATION

BY MR. WILMER:

Q    State your name for the record, please, sir.

A    M. Bruce Graham.

Q    Mr. Graham, where are you from?

A    Tuscaloosa, Alabama, originally.

Q    And what is your profession?

A    Alabama probation and parole officer.

Q    Okay.  And where is your office?

A    I'm assigned to the Athens, Alabama field office.

Q    Do you perform services in this courthouse from time to
time?

A    Yes, sir.

Q    Do you testify in cases from time to time?

A    Periodically, yes, sir.

Q    Do you know Robert Ray, Jr.?

A    Yes, sir.

Q    How do you know Mr. Ray?

A    Robert Earl Ray, Jr. was paroled from the department of
corrections and placed under my supervision.

Q    And do you know when that was?

A    No, sir.  Not exactly.

Q    Was that in about 1994?

A    Possibly before I came to Athens, yes, sir.

Q    When did you become his parole officer?

A    August of '98.

Q    Were you his probation officer in late 1999 early 2000 timeframe?

A    Yes, sir.  Parole officer, yes, sir.

Q    Did I say probation?

A    Yes, sir.

Q    I'm sorry.  More specifically, were you his parole officer in the timeframe between December 27, 1999 and January 7, 2000?

A    Yes, sir.

Q    Do your parolees check in with you from time to time?

A    Yes, sir.  Minimum of once per month.

Q    Do they have a requirement to check in with you when they change jobs?

A    Yes, sir.

Q    Okay.  Did Robert Ray in early January notify you that he was no longer working at Christopher Plumbing and Electric?

A    Yes, sir, he did.

Q    And did he tell you why he was no longer working at Christopher Plumbing and Electric?

A    Yes, sir, he did.

Q    Tell the Court what he told you.

A    Mr. Ray came to my office for his monthly report and stated that he had left his employment at Christopher Plumbing and Electric because some of his co-workers were smoking

marijuana -- pot on the job and bad-mouthing him. He didn't

seem to be fitting in with them, so he said he had walked off

the job. He expressed concern that the marijuana residue might

get in his system.

Q    He didn't want to be associated with any indirect smoke?

A    Yes, sir. That's what he was insinuating, yes, sir.

Q    And what did you say to him then?

A    I don't recall.

Q    You just recorded that event?

A    I recorded that event and told him he needed to find

employment.

Q    And so did he find employment? - Found Job

A    Yes, sir.

Q    Found employment at Burgreen?

A    He went to Burgreen, yes, sir.

Q    Around the timeframe of 2001, was there a parole hearing

that you attended for Mr. Ray?

A    Yes, sir. There were two parole hearings, but yes, sir.

Q    Now, there has been some evidence in this court that he

was picked up on a misdemeanor. Was that a hearing on the

misdemeanor?

A    Yes, sir. The parole revocation hearing addressed the

assault third, domestic assault, alleged domestic assault and

me, adhering to the pardon and parole's domestic policy, we

took action.

Q    Was there testimony in that hearing about things that

Mr. Ray did in the nature of a misdemeanor that gave rise

to the hearing?

A     Yes, sir.

Q     Tell the Court, if you would, what those things were     *Heresay*

and who accused him of those things.                           *Testimoy*

        MR. WARREN:     Your Honor, I object.   This is

obvious heresay.

        MR. WILMER:     This goes to creditability, Your

Honor.   It isn't for the truth of the matter asserted.

        MR. WARREN:     It's rank hearsay   He's now

asking this witness to repeat what the charges from this

client were in the courtroom.

        THE COURT:     I'm going to have to sustain.

Q     Did Mr. Ray testify in the hearing?

A     Yes, sir.

Q     Did Mr. Ray respond to the charges of Lorinna Devita?

A     Yes, sir, through his attorney, yes, sir. \

Q     And who was his attorney?

A     Joe Powell.

Q     And what charges did he respond to?  *D·d I?*

A     The alleged domestic assaults, more specifically, he

denied.

Q     What things did he deny?

A     He denied when Ms. Cazares stated he had intentionally

burned her with coffee, put lit cigaretts to her naked flesh,

hit her and blackened her eye, which the Decatur Police do have

that documented.  Originally, that is how I got notified of it.
Officer McNeil with the Decatur Police Department called my
attention to it.

Q    Okay.  Did he deny any other allegations made by
Ms. Devita?

A    No.  Just everything that was pertaining to the alleged
assault.

Q    Did he deny assaulting her in front of her children?

A    Yes.

Q    Did he deny putting a cigarette out on her flesh?

A    Yes, sir.

Q    Did he deny a great deal of drug use?  *never was Questioned*

A    Yes, sir.

Q    As a result of that hearing, did the parole board take
action against Mr. Ray?

A    Yes, sir.  The parole board did.  They gathered all
the evidence from the hearing, testimony that was taken, and
they did take action, yes, sir.

Q    What was the action?

A    They decided and determined there was enough evidence
to revoke Mr. Ray's parole.

Q    And sent him back to prison?

A    Yes, sir.

Q    Did Ms. Davilla later drop the misdemeanor case?

A    I think she was advised through an attorney here in town --

       MR. WARREN:    Objection.  Double hearsay.

*She was harassed by the parole ofracor the state would push it or how cidwel
to drop the misdemean*

THE COURT: Sustained.

MR. WILMER: Withdrawn. No further questions.

THE COURT: All right. Cross.

CROSS-EXAMINATION

BY MR. WARREN:

Q    Mr. Graham, you and I have never met face to face, have we?

A    No, sir.

Q    I spoke with you by telephone on April 23, 2002, just a couple of days ago?

A    On or about, yes, sir.

Q    Your phone number was 233-4043?

A    Yes, sir.

Q    Telephone call being approximately 8:15 in the morning?

A    Yes, sir.

Q    Do you remember me asking you to tell me your recollection of the conversation you had with Robert Ray after his employment ended with the Christopher brothers?

A    Yes, sir.

Q    And do you remember telling me that that was the very same question Mr. Wilmer wanted to know from you?

A    Yes, sir. I'm sure I said that, yes, sir.

Q    Do you remember telling me that you never documented the conversation and you couldn't swear one hundred percent to the conversation since it was over a year and a half ago?

A    Documented here, as far as written documents, DOC notes, the exact quote was never documented.

Q    But did you tell me just a couple days ago that you couldn't swear one hundred percent to the conversation because it's been a year and a half ago?

A    I said I could swear to his reason for leaving Christopher but not verbatim the conversation, no, like, who was bad-mouthing him, who was actually smoking the drugs on the job.

Q    Did you tell me the part about the drugs when I talked to you?

A    No.

Q    You didn't tell me that earlier, did you?

A    No, I don't think we discussed that.

Q    You told me that Robert told you words to the effect, he either quit the company because they wouldn't let him go to the doctor, is that what you told me a few days ago?

A    No, sir, I don't recall you telling me that.

Q    Did you tell me Robert came in and told you something to the effect that he had either quit or the company would not let him go to the doctor?

A    No. I think my quote was that they were smoking illegal drugs on the job, and his co-workers were bad-mouthing him and he walked off the job.

Q    Your testimony under oath is that that's what you told me two or three days ago?

A    Yes, sir.

Q    Lorinna Davilla, the lady that made the assault charge, have you met her?

A    Yes, sir.

Q    Did you know her before the hearing?

A    Yes, sir.

Q    How did you know her before the hearing?

A    She had come as a collateral contact when Mr. Ray reported to the parole office.  We're required to have collateral contacts, such as, employment verification, husband, girlfriend, wife, family member, et cetera, and she had come in one time, and that was how I initially met her.

Q    Have you had any contact with her since the hearing?

A    Yes, sir.

Q    How?

A    The first time he allegedly assaulted her, she came to my office and confided in me and showed me bruises, which I photographed.

Q    Have you had any social contact with her since the hearing took place?

A    Yes.  We've done lunch before.

Q    You've had lunch with the complaining witness?

A    Yes, sir, I have, after the fact.

Q    Was it a lunch date?

A    Sure, it was.

Q    Have you been to her home?

A    No.

Q    Did you initiate the lunch date?  Did you ask her to go eat lunch with you?

A    Yes.

Q    Did you report to any law enforcement people that marijuana was being smoked at the Christopher worksite?

A    No, ma'am, I didn't.

Q    In your job position are you somewhat of a quasi police authority?

A    What does the term quasi mean?

Q    Do you work with police officials?

A    Periodically, yes, sir.

Q    When Mr. Ray reported to you that the reason that he left was because co-workers were smoking marijuana, you didn't feel it incumbent upon you to report that to police and check it out?

A    No, sir.  Robert Ray was my parolee, and I was focusing my attention on supervising him.  No, sir, I didn't feel the need to do that.

Q    Do you like Robert?

         MR. WILMER:    Objection, Your Honor.

         THE COURT:    Sustained.

         MR. WARREN:    That's all.

         MR. WILMER:    No further questions.

         THE COURT:    Thank you for your testimony.


         *  *  *  *  *  *  *  *  *  *  *

<u>CERTIFICATE</u>

Robert Earl Ray, Jr.,

     Plaintiff,

   vs.         Case Number  CV 98-399

Christopher Plumbing and

Electric,

     Defendant.


\* \* \* \* \* \* \* \*


   I hereby certify that the foregoing transcript is a
true and correct copy of the requested proceedings taken
in the above-styled case.

   Dated this __23__ day of __August_____, 2002.


      _Rigeana L. Gentry_
      Rigeana L. Gentry
      Official Court Reporter

## To Whom This May Concern:

EX-10

I Kelly A. Adams being of sound mind and body, do here by declare that the evidence that I'am giving is the truth.

I was at Lorena C.Davila's apartment on Oct.6th of this year.Lorena invited myself and several members of her family over for a party.There was alcohol for minors and adults.Lorena made a phone call around 9:30pm.she called Bruce Graham,stated that she "wanted him to come over to the party.

Lorena tells the guest and myself that Bruce will be over later,because he had to take a shower because he had been at the bar drinking.

Around 12:45am. there was a knock at the door,Lorena introduces her guest as Bruce Graham" her boyfriend"

Lorena and Bruce talk to other members at the party, her cousin states to Bruce Graham" who did you say that you were again?"In a puzzling manner,I didn't question it because I thought that the family already knew him, due to the fact she introduced him as her boyfriend.

Lorena and Bruce stayed in the living room for about 15mins.Where everyone was drinking. About 1:00am. Lorena and Bruce go to her bedroom,they were in there for about an hour and half.When Lorena and Bruce came out of her bedroom she had changed her clothes.

Bruce said bye to everyone,and walked out the door.Lorena followed him to his car,she was out there

Ex-10

maybe 15 to 20mins.

Lorena returns stating "That she was sorry, that Bruce had to leave so soon but he felt uncomfortable."knowing that Robert Ray had been in the same bed as he had.

Kelly A. Adams

Signature: _Kelly A. Adams_
Witness: _____
Witness: _____

My Commission Expires 09-23-2004

" **Ex**          Ex-11

I Luis Lopez, Lorena Davila cousin
was at Lorena's hose Oct 6 2001.
She had a party at her house
and I was there at her party.
Me + several others, around 9:30pm
Lorena called Bruce Graham and
told him to come over Lorena
told all of us, it would be a
little while before Bruce could come
cause he had been out at a bar
and needed to take a shower.
Bruce Knocked at the door at
about 12:30 or 1:00 A.M. Lorena then
introduced Bruce to everyone as
her boyfriend, I then asked Lorena
was she sure that it would be
alright For Bruce to be there with
me + mygirlfriend, and Lorena said
Oh, he's cool, Lorena and Bruce was
in the Living room with every gone
else For maybe 30 minutes. Bruce and
Lorena then went to her room.
They stayed in there about 1 hour
and a half when they came back
to the Living room Lorena had changed
clothes, so I asked was she living



Ex-11

She told me no that Bruce was fixing to go. She then walked Bruce to the car. She was gone about 20 minutes. Lorena told every body Bruce left cause he felt uncomfortable Knowing Robert had been there.

Luis Lopez

Luis Lopez

## AFFIDAVIT

I Jamie Denise Yarbrough a resident of Limestone county Alabama and I am over the age of twenty-one. I hereby swear under the penalty of perjury that the following is true and correct.

On the 9th day of November one Louis Lopez went to the parole agency wherein he testified before the Honorable Steve Sirmon attorney for the parole board and Ms. Ann Cargo, Director of all parole officers in the state of Alabama.

In his testimony he stated that he was the one that actually caused all the injuries that Ms. Lorena Davilla alleged that Robert Ray caused when making her report to the Athens police department stating that the actual injuries were caused on the 17th day of August 2001, resulting in Robert's parole being revoked.

He stated that he hit her in the eye. He kicked her in the chest and stomach in the back. He also testified that he was at her apartment the night that Roberts parole officer Bruce Graham came over and had sexual relations with Robert's girl friend.

I presented the actual tape recording in which Robert presented in the revocation hearing wherein it states that Ms. Davilla told him she hit her eye on a door when picking up a towel. This recording proved that Robert did not cause the injuries and it also proves that the hearing officer T.C. Bill concealed part of the recording when making his report to the parole board, therefore concealing evidence that Robert was actually innocent.



Steve Sirmon stated that he had heard enough and that Robert should be released in the near future stating late December or first of January 2007. Ms. Ann Cargo wanted to bargain with Robert's parole, If Robert was willing to drop the law suit in exchange for his parole. Ms. Cargo sought such action and Steve Sirmon explain that she could not bargain with Roberts freedom in exchange to him dropping the law suit.

I submit these facts under the penalty of perjury and request that Robert will be reinstated on parole. Done on this the 10th day of November 2006.

JAMIE DENISE YARBROUGH

Sworn before me on this the 15TH day of November 2006.

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Jan 28, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

NOTARY PUBLIC

MY COMMISSION EXPIRES



Ex - A3

## AFFIDAVIT

I Louis Lopez a resident of Limestone County Alabama and I am over the age of twenty-one and hereby swear under the penalty of perjury that the foregoing is true and correct. On the 9th day of November, 2006 I appeared before the Honorable Steve Sirmon attorney for the parole agency and Ann Cargo director of field services over all district parole officers in the state of Alabama. The following person(s) at the meeting accompanied me:

1. Jamie Denise Yarbrough 2. Kelly Adams 3. James Oliver 4. Brenda Oliver.


I was prepared to present testimony to the parole board that would have proven that Robert Earl Ray, Jr. did not cause or commit any injury to Lorena cazares Davilla in which his parole was revoked.


My testimony was stated to the above-mentioned person(s) of the parole agency in the presence of the other mention person(s), that on the 17th day of August 2001, I engaged in a heated argument with Lorena Davilla, which is my first cousin.


As a result of that argument, we did get into a physical fight. I admit that it was I who caused every injury named by her in the report against Robert Ray to the police with the exception of burning her with lit cigarettes or pouring hot coffee on her, that is a lie.


I did hit her in the eye. I kicked her in the chest. I hit her in the stomach. I hit her arm and her hips and her back. I knew that she called the police, but at the time of the report I did not know that she told the officer that Robert Ray caused those injuries.





Robert did not cause those injuries, I did. I also testified that I was at her apartment when Marty Bruce Graham came and introduced himself. He and Lorena went into her bedroom and had sex. I did not know that Robert's parole officer could do that, being that he was his parole officer.

I voluntarily went to Robert's parents and told them the truth. They asked me if I would be willing to tell the same testimony to the parole board or person(s) of the parole agency? I stated yes. So I went and testified to the above mention facts.

I have told this to the parole people so they can release Robert from prison he is actually innocent. Done on the 11th day of November 2006.

_____

**LOUIS LOPEZ**

I swear under the penalty of perjury that the forgoing is true and correct. Sworn to and subscribed on this 15th _____ day of November 2006.

_____
**NOTARY PUBLIC**

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Jan 28, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

**MY COMMISSION EXPIRES**

